UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



Lodging Solutions, LLC d/b/a Accommodations Plus International,

                Plaintiff,

—v—

Robert Miller, Fleetcor Technologies, Inc., Travelliance, Inc., and Corporate Lodging Consultants, Inc.,

                Defendants.

19-CV-10806 (AJN)

FINDINGS OF FACT
AND CONCLUSIONS
OF LAW

ALISON J. NATHAN, District Judge:

Plaintiff Lodging Solutions, doing business as Accommodations Plus International ("API"), has moved for a preliminary injunction blocking Defendant Robert Miller from beginning his employment at Defendant Corporate Lodging Consultants ("CLC") and its parent company, Defendant Fleetcor Technologies. For the reasons set forth below, Plaintiff's motion for a preliminary injunction is DENIED.[1]

## I. BACKGROUND

### A. Factual Background

Plaintiff API is a travel management company that helps crews and employees in the airline, cruise line, and rail industries find lodging. This is largely accomplished through their technology platform. For nearly a decade, Defendant Robert Miller was a Vice President of

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law to the extent required by Federal Rules of Civil Procedure 52 and 65. Any findings at this stage "are not binding at a trial on the merits." *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1049 (2d Cir. 1992).

1

Business Development and a successful salesman for API; but on October 18, 2019, Miller submitted his letter of resignation. Now, Miller seeks to take his talents to Defendant Fleetcor, and specifically CLC, its subsidiary. CLC operates primarily in the corporate lodging space, as opposed to the transportation sector. However, they do provide lodging for rail crews, as does API. This litigation arises out of Miller's attempted move to CLC.

### B. Procedural History

On November 11, 2019, Plaintiff sued Defendants in New York Supreme Court, alleging breach of a restrictive covenant in Miller's employment agreement, misappropriation of trade secrets, unfair competition, breach of a duty of loyalty, and tortious interference. Plaintiff subsequently added a claim that Fleetcor breached a non-solicitation clause contained in a non-disclosure agreement executed while Fleetcor was in talks to buy API. Plaintiff also moved for temporary injunctive relief ordering Miller to return any confidential API information still in his possession, preventing him from using or accessing any API confidential information, and preventing him from beginning his new position at CLC. The state court judge granted some of the temporary relief, including blocking Miller from using any API confidential information, but denied the request to enjoin Miller from beginning his new employment at CLC.

Plaintiff then discontinued the state court action and, on November 21, 2019, filed this action alleging the same claims as above, while also adding a federal misappropriation of trade secrets cause of action. Dkt. No. 1. Plaintiff moved for a temporary restraining order: 1) enjoining Miller from accessing his Outlook email; 2) ordering Miller to return all API data still in his possession; 3) enjoining Miller from using any nonpublic API information; 4) ordering Miller to provide API access to his electronic devices; 5) enjoining Fleetcor from allowing Miller to begin employment there; and 6) ordering Fleetcor to perform on its contract with API.

Defendants consented to much of this relief. Specifically, they stipulated to an order: 1) enjoining Miller from copying or sharing information in his Microsoft Outlook cloud account; 2) ordering Miller to return any API data still in his possession; 3) enjoining Miller from using any nonpublic information obtained from API; and 4) ordering Miller to provide API with access to all electronic devices that he used to store, access, or otherwise interact with API data. *See* Dkt. No. 8. But Defendants again objected to an order preventing Miller from beginning his new position at CLC. On November 22, 2019, this Court denied the motion for a TRO enjoining Miller from beginning his new employment, on the basis that Plaintiff had failed to carry its burden of showing irreparable harm. Notwithstanding the Court's decision, Defendants voluntarily decided to push back Miller's start date into the new year, and have agreed that the temporary relief enjoining Miller from using API confidential information will remain in place for the pendency of this action. Tr. 299:3-12. Plaintiff then converted its motion for a TRO into a motion for a preliminary injunction, with the intention of augmenting the evidentiary record. For purposes of this preliminary injunction motion, the only issue before the Court is whether Miller may begin his employment at CLC during the pendency of this litigation.[2] The Court held an evidentiary hearing on December 17, 2019, and the parties gave oral summations on December 19, 2019.

## II. DISCUSSION

---

[2] The briefing, hearing, and oral summations focused on whether the Court should grant a preliminary injunction preventing Miller from joining CLC and ordering Fleetcor to perform on its contract. However, the stipulated order to show cause also refers to an injunction preventing Miller from accessing his Microsoft Outlook cloud account and an order enjoining Miller from using any nonpublic information obtained at API. *See* Dkt. No. 8. To the extent Plaintiff still seeks the former, the Court denies the request because, as discussed below, it credits Miller's testimony that he will not use any API confidential information for at least the first year at CLC. *See* Tr. 202-203. Furthermore, Plaintiff conceded at oral argument that the contacts in the Outlook account are not trade secrets. *See* Tr. 312:7-12. The latter request is mooted by Defendants' consent to extend the temporary relief previously granted in this case, *see* Tr. 299:3-12, as well as by the Court's determination that Miller is unlikely to misappropriate API's alleged trade secrets.

A party seeking a preliminary injunction "must show (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Trump v. Vance*, 941 F.3d 631, 639 (2d Cir. 2019) (quotation omitted). Here, the Court concludes that Plaintiff has failed to meet its burden of showing irreparable harm.

The Second Circuit has described irreparable harm as an "injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *New York v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015) (quoting *Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999)). "Irreparable harm . . . is the '*sine qua non* for preliminary injunctive relief.'" *JBR, Inc. v. Keurig Green Mt., Inc.*, 618 F. App'x 31, 33 (2d Cir. 2015) (quoting *USA Recycling, Inc. v. Town of Babylon*, 66 F.3d 1272, 1295 (2d Cir. 1995)). Accordingly, a Court must find a "likelihood that the moving party will suffer irreparable harm if a preliminary injunction is not granted . . . 'before the other requirements for the issuance of [a preliminary] injunction will be considered.'" *JBR, Inc.*, 618 F. App'x at 33 (quoting *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1998) (per curiam)) (last alteration in original).

Plaintiff advances several theories as to how Miller's employment at CLC would lead to irreparable harm. The Court addresses each of these in turn.

A. **Miller Is Unlikely to Misappropriate Trade Secrets**

Plaintiff claims that Miller possesses API trade secrets, principally in the form of details regarding API's contracts with its customers and the ways in which API customizes its technology platform for individual customers. It contends that if Plaintiff does not have physical

4

or electronic copies of this information, then he at the very least possesses it by virtue of his memory. Plaintiff further argues that Miller is likely to misappropriate these alleged trade secrets if he goes to work for CLC. Misappropriation of trade secrets can in some cases lead to irreparable harm. *See Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118-19 (2d Cir. 2009). Defendants disagree that Miller possesses trade secret information and further dispute that Miller is likely to even disclose or otherwise use this information in his new position. The Court concludes that even if the information at issue constitutes trade secrets, Miller is unlikely to misappropriate, use, or disclose this information in his new role at CLC.

First, the Court finds that Miller is unlikely to intentionally use or disclose any of the information that API claims to be a trade secret. Miller stated under oath, repeatedly and unambiguously that he will not use or disclose any of the information deemed by API to be confidential, including contact information, for at least his first year at CLC. *See, e.g.*, Tr. 201-204. The Court credits this testimony. *See IBM Corp. v. Visentin*, Case No. 11-cv-399, 2011 U.S. Dist. LEXIS 15342, at *39 (S.D.N.Y. Feb. 16, 2011), *aff'd*, 437 F. App'x 53 (2d Cir. 2011); *Am. Airlines, Inc. v. Imhof*, 620 F. Supp. 2d 574, 581 (S.D.N.Y. 2009). Ron Rogers, President of CLC, further stated in a sworn affidavit that Miller's new position will not require him to disclose trade secret information. *See* Rogers Affidavit, Dkt. No. 11, ¶¶ 7-9. Indeed, as discussed below, for at least the first year of his new employment, Miller will not work in the airline, cruise line, and rail segments. Plaintiff was unable to put forth any evidence that Miller still possesses physical or electronic copies of API confidential information. Under cross-examination, Plaintiff's own forensic expert conceded that he has, as of yet, been unable to find any evidence that Miller copied API information. *See* Tr. 129-130.

Plaintiff counters that Miller is not a credible witness. It points primarily to testimony that Miller gave regarding why he accessed and then deleted several files on October 18, 2019, the morning of his resignation. Plaintiff claims these files contained confidential information, such as the expiration dates for API's current contracts. On the stand, Miller claimed that he viewed this information in preparation for his duties at API. *See* Tr. 194. While Miller knew he would be submitting his resignation, he testified that he still thought it was possible that he would continue working at API for the next couple weeks. However, Plaintiff points out, if Miller did indeed believe that the information was potentially useful in the near future, it would be illogical for him to delete the file right after accessing it. *See* Tr. 215-216. While Plaintiff conceded at oral argument that this inconsistency is not enough to discredit Miller, it contends that when combined with Whatsapp/text messages from months earlier, it gives rise to an inference that Miller either made copies of some of this information or intends to disclose confidential API information in his head. The messages, from the Spring of 2019, indicate that Miller intended to wipe all of his files when he left API. *See* Tr. 146.

While the Court agrees that Miller's testimony regarding the deleted files was contradictory, it concludes that this is not enough to entirely discredit Miller as a witness and to disbelieve his sworn assurances that he has no intent to disclose confidential API information at CLC. Moreover, Miller's longstanding plan to wipe his files does not clearly support the inference that he is likely to copy or misappropriate what is contained in those files. Even Plaintiff's own witness, Ramzi Kamel, conceded on the stand that if Miller simply accessed the files and then deleted them, the threat of harm to API would be minimal. *See* Tr. 236. Miller testified under the penalty of perjury that he will not disclose or use any of API's confidential

information at CLC. Despite the above concerns, the Court ultimately finds this testimony credible.

The Court also concludes Miller is unlikely to inadvertently disclose any of API's alleged trade secrets. On occasion, courts have found that "even assuming the best of good faith," a defendant changing jobs is inevitably going to misappropriate trade secrets in situations where "it is doubtful whether the defendant could completely divorce his knowledge of the trade secrets from any . . . work he might engage in." *Estee Lauder Cos. v. Batra*, 430 F. Supp. 2d 158, 176 (S.D.N.Y. 2006) (quotation omitted); *see also Payment Alliance Int'l, Inc. v. Ferreira*, 530 F. Supp. 2d 477, 482 (S.D.N.Y. 2007) ("[E]ven if [the defendant] acted with the best of intentions, he may unintentionally transmit information gained through his [former employment] during his day to day contact with his new employer.") (quotation omitted). While courts consider a number of case-specific factors when the evaluating the possibility of inevitable disclosure, they typically find that it is likely to occur only if the employee's new role places the employee "in direct competition with his former employer." *IBM v. Papermaster*, Case No. 08-cv-9078, 2008 U.S. Dist. LEXIS 95516, at *28 (S.D.N.Y. Nov. 21, 2008).

Here, while CLC does compete directly with API in the rail industry, Miller's role, at least for his first year, shall be limited only to workforce lodging. *See* Tr. 185:24-25. He will not work in the airline, cruise line, or rail segments, which ensures that he will not be in direct competition with API. *See Visentin*, 2011 U.S. Dist. LEXIS 15342, at *45, *51-*52, *55 (agreement to limit job responsibilities diminished risk of inevitable disclosure of trade secrets). Moreover, the alleged trade secret information at issue—client contract details and specific customizations of API's technology platform for customers—are customer and sector specific. Since Miller will not be working in the airline, cruise line, or rail sectors, at least for the first year

of his new employment, this information will be of limited utility to him. Miller's new position is not "nearly identical to his old one, such that he could not reasonably be expected to fulfill his new job responsibilities without utilizing the trade secrets of his former employer." *Payment Alliance Int'l, Inc.*, 530 F. Supp. 2d at 482 (quotation omitted). He is therefore unlikely to inadvertently disclose the alleged API trade secrets at CLC.

### B. Plaintiff's Other Theories of Irreparable Harm Are Unavailing

Plaintiff argues that even if Miller does not misappropriate trade secrets, his employment at CLC will cause API to lose customer relationships and associated goodwill, resulting in irreparable harm. However, given that for the first year Miller will not be directly competing with API as discussed above, his employment will not result in the loss of customer relationships. He will not be soliciting API customers or prospective customers for at least his first year at CLC. Plaintiff also claims that its client relationships and reputation will be irreparably harmed if Miller works for CLC, because it will demonstrate that Plaintiff is unable to enforce its agreements. However, Plaintiff never established *why* the ability to enforce restrictive covenants is of concern to its client base. Moreover, if Plaintiff's theory was valid, then virtually any person or entity who tries to seek a preliminary injunction based on a breach of contract claim could show irreparable harm. No authority supports this result.

Additionally, Plaintiff contends that Miller's departure and move to CLC would harm API's reputation, because Miller is well known in the industry. *See* Tr. 39:13-15. But this theory rests on the limited if not conclusory testimony of API CEO Richard McCleer. *Id.* API did adduce more evidence regarding the impact of the loss of a client on its reputation, but losing a client is not necessarily analogous to losing an employee. This theory of irreparable harm is too "speculative" to support a preliminary injunction. *Actavis PLC*, 787 F.3d at 660 (quotation

8

omitted). And to the extent that API's reputation is damaged, that harm is more likely to be a product of Miller's departure from API—which has already occurred and will not change no matter the result in this litigation—rather than his move to Fleetcor/CLC specifically.

Finally, Plaintiff argues that irreparable harm is likely to occur, because both Miller and Fleetcor's respective contracts contained provisions stating that breach of those agreements would create irreparable harm. In the context of restrictive covenants, the Second Circuit has stated that such clauses "might arguably be viewed as an admission by [defendant] that plaintiff will suffer irreparable harm were he to breach." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999). But as Plaintiff concedes, this is not dispositive. *See* Dkt. No. 22, at 13. While the provisions are admittedly relevant, "parties to a contract cannot, 'by including certain language in that contract, create a right to injunctive relief where it would otherwise be inappropriate.'" *Visentin*, 2011 U.S. Dist. LEXIS 15342, at *22 n.4 (quoting *Firemen's Ins. Co. of Newark v. Keating*, 753 F. Supp. 1146, 1154 (S.D.N.Y. 1990)). Plaintiff has not shown a likelihood of irreparable harm, and the existence of these two clauses does not change that fact. *See West Publ'g Corp. v. Coiteux*, Case No. 16-cv-6825, 2017 U.S. Dist. LEXIS 145454, at *12-*13 (S.D.N.Y. Aug. 25, 2017).

### III. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction is DENIED. The Court will schedule an initial pretrial conference by separate order.

This resolves Dkt. No. 8.

SO ORDERED.

Dated: December 23, 2019
New York, New York

_____
ALISON J. NATHAN
United States District Judge