UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



Lodging Solutions, LLC d/b/a Accommodations
Plus International,

                    Plaintiff,

       –v–

Robert Miller, Fleetcor Technologies, Inc.,
Travelliance, Inc., and Corporate Lodging
Consultants, Inc.,

                  Defendants.

19-cv-10806 (AJN)

MEMORANDUM
OPINION & ORDER

ALISON J. NATHAN, District Judge:

Plaintiff Lodging Solutions, doing business as Accommodations Plus International

("API") has brought this lawsuit against its former employee Defendant Robert Miller; his new

employer, Defendant Corporate Lodging Consultants ("CLC"); its parent company, Defendant

Fleetcor Technologies; and a different Fleetcor subsidiary, Travelliance, Inc.  Defendants now

move to dismiss the Amended Complaint in its entirety for failure to state a claim.  For the

reasons set forth below, Defendants' motion is GRANTED in part and DENIED in part.

## I.   BACKGROUND

The following facts are drawn from the Amended Complaint and assumed to be true for

purposes of this motion to dismiss.

Plaintiff API is a travel management company that provides crew accommodations to

those in the transportation industry.  Amended Complaint (Amend. Compl.), Dkt. No. 72, ¶¶ 25–

26.  That is, when crews in the transportation industry (including airline and rail crews) need to

stay overnight, their employers will hire API to arrange for the accommodations.  *Id.*  API in turn

will negotiate favorable rates for its clients.  *Id.*  The centerpiece of API's business is its Technology Platform, which is customized for each client's specifications.  *Id.* ¶ 29.  Some of these client demands can be highly specific, such as the particular floors on which crews must sleep or their distance from the airport.  *Id.*  Plaintiff alleges that its clients require it to sign non-disclosure agreements for much of the information entered into the Technology Platform and that it treats this information as highly confidential.  *Id.* ¶¶ 29–30.

Robert Miller was formerly Vice President of Business Development for Plaintiff. Because of his position, Miller was allegedly one of the few employees who had access to all of Plaintiff's confidential information, such as the details of its contracts with clients, incentives provided to clients, client specifications, how the technology platform functions, and its negotiations with accommodation vendors.  *Id.* ¶ 31-32, 35–36.  Miller's employment agreement included a confidentiality provision.  *Id.* ¶¶ 39, 44–45.  It also included a restrictive covenant that prohibited Miller for one year after he left Plaintiff's employ, from being "employed by, consult[ing] with, own[ing], operat[ing] or be[ing] associated in any similar capacity with" Travelliance, one of Plaintiff's main competitors.  *Id.* ¶¶ 43, 53–54.

In June of 2018, Fleetcor approached Plaintiff about potentially being acquired by Fleetcor.  *Id.* ¶ 48.  As a prerequisite to these negotiations, Plaintiff insisted that it and Fleetcor enter into a non-disclosure agreement.  *Id.* ¶ 49.  As discussed below, that agreement included a restrictive covenant that prohibited Fleetcor from hiring API employees.  *Id.* ¶¶ 50–51. Acquisition negotiations between Plaintiff and Fleetcor allegedly continued into the fall of 2019, but proved to be unfruitful.  *Id.* ¶ 73.

Meanwhile, Travelliance was allegedly attempting to hire away Plaintiff's employees. Travelliance tried to hire Paul Wardlow, another of Plaintiff's Vice Presidents of Business

Development, but he declined.  *Id.* ¶¶ 55-56.  It also allegedly began soliciting Miller as early as March 2019.  *Id.* ¶ 58.  Miller allegedly indicated to Wardlow that he would only be interested in leaving Plaintiff if Fleetcor acquired Travelliance.  *Id.* ¶ 57.  On July 15, 2019, Plaintiff claims Miller met with Fleetcor executives including the President of Fleetcor's subsidiary, CLC.  As its name suggests, CLC operates in the corporate lodging space, as opposed to the transportation sector.  *Id.* ¶ 82.  But it also allegedly competes with API to provide lodging for rail crews.  *Id.* ¶ 61.  Miller claims that he "had agreed upon employment terms that would go into effect after Fleetcor acquired Travelliance."  *Id.* ¶ 63.  Plaintiff claims that Miller's acceptance, as well as Fleetcor's offer, was conditioned on Fleetcor successfully acquiring Travelliance.  *Id.*  Due to rumors of Miller's departure, Plaintiff asked Travelliance and Fleetcor whether Travelliance was soliciting Miller or other employees.  Travelliance allegedly denied soliciting Plaintiff's employees, while Fleetcor responded that that they could not comment because they did not own Travelliance.  *Id.* ¶¶ 64–65.

Subsequently, on October 2, 2019, Fleetcor announced that it was acquiring Travelliance.  *Id.* ¶ 66.  Plaintiff alleges that it asked Fleetcor on October 7, 2019 whether it was soliciting Miller, and that Fleetcor falsely responded that it would abide by its agreements. *Id.* ¶¶ 70–73, 169.

Then, on October 18, 2019, Miller submitted his letter of resignation to Plaintiff.  *Id.* ¶ 77.  As discussed below, Plaintiff alleges that in the days and hours leading up to his resignation, Miller repeatedly accessed confidential information on an external hard drive.  *Id.* ¶¶ 77, 79.  Plaintiff further alleges that Miller deleted some of the files on the external hard drive before returning it to Plaintiff, which prevents Plaintiff from determining the full extent of the information Miller was accessing in advance of his resignation.  *Id.* ¶ 79.

Miller's letter of resignation stated that he would be working "for Fleetcor, working exclusively in the company's Corporate Lodging businesses." *Id.* ¶ 82.  In response to cease-and-desist letters sent by Plaintiff, Fleetcor allegedly stated that "Miller will work for CLC, a wholly-owned subsidiary of Fleetcor, which has separate leadership, separate budgets, separate sales and financial objectives, and which runs independently of Travelliance.  Mr. Miller will be reporting to the President of CLC, not the President of Travelliance." *Id.* ¶ 85.  This lawsuit followed.

## II.     LEGAL STANDARD

To withstand a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A plaintiff is not required to provide "detailed factual allegations" in the complaint but must assert "more than labels and conclusions." *Twombly*, 550 U.S. at 555.  Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* The Court must accept the allegations in the complaint as true and draw all reasonable inferences in the non-movant's favor.  *ATSI Communs, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

## III.    DISCUSSION

### A.  Plaintiff has stated a misappropriation claim under the Defend Trade Secrets Act (Count 1)

A claim under the Defend Trade Secrets Act ("DTSA") requires that the plaintiff owns a trade secret and that the defendant has misappropriated it.  *See* 18 U.S.C. § 1836(b)(1).

Under the DTSA, a trade secret is defined as "all forms and types of financial, business, scientific, technical, economic, or engineering information . . . (A) the owner thereof has taken

reasonable measures to keep such information secret; and (B) . . . derives independent economic value . . . from not being generally known . . . [or] readily ascertainable . . . [to] another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3).  Plaintiff has alleged that it owned trade secrets, such as contract details, customer requirements, details of arrangements with vendors, as well as other financial information. Amend. Compl. ¶¶ 29–31, 77.  Defendants argue that the information at issue such as "customer information  . . . qualifies for trade secret status only when it cannot be readily acquired from non-confidential sources."  Dkt. No. 80, at 4.  But Plaintiff has alleged that this information was not publicly available and that it took numerous steps to safeguard its secrecy, such as limiting access, requiring employees to sign non-disclosure agreements, and creating audit trails when data is accessed.  *See* Amend. Comp. ¶¶ 29–30, 33–40.  Aside from mere contact information, these allegations are plausible.  The Amended Complaint also alleges that Plaintiff itself is required by its own clients to sign non-disclosure agreements for much of this information.  *Id.* ¶ 29.

Likewise, Plaintiff has plausibly alleged that Miller misappropriated under the federal standard.  The DTSA creates three possible avenues to a finding of misappropriation: "(1) acquisition, (2) disclosure, or (3) use."  *AUA Private Equity Partners, LLC v. Soto*, No. 17-cv-8035, 2018 U.S. Dist. LEXIS 58356, at *12 (S.D.N.Y. Apr. 5, 2018).  With regard to acquisition, the DTSA provides that "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" constitutes "misappropriation."  18 U.S.C. § 1839(5)(A).  Courts in this District have held that an employee copying trade secret information for purposes unrelated to her employment in violation of a confidentiality agreement constitutes misappropriation under the DTSA's acquisition prong.  *See*

*ExpertConnect, L.L.C. v. Fowler*, No. 18-cv-4828, 2019 U.S. Dist. LEXIS 114931, at *15–16 (S.D.N.Y. July 10, 2019); *AUA Private Equity Partners*, 2018 U.S. Dist. LEXIS 58356, at *20–21.

Defendants do not take issue with the holdings in these cases, but rather argue that the Plaintiff has failed to plausibly allege that such acquisition occurred.  Plaintiff alleges that "[d]uring the week leading up to and including" the date of Miller's resignation, Miller repeatedly accessed trade secrets including information about "contract expiration dates, airline and railroad client lists, technological solutions to client requirements, and API profitability analyses."  Amend. Compl. ¶ 77.  This list of information contains more than just contact information and is specific enough to put Defendants on notice of what Miller is accused of misappropriating.  And while the mere allegation that Miller accessed trade secret information may not be enough to support an allegation of acquisition, the unusual circumstances under which Miller is alleged to have accessed the information are.  Miller is alleged to have deleted files from an external hard drive which prevents Plaintiff from determining the full scope of information that Miller accessed and may have copied from that hard drive.  *Id.* ¶ 79.  Relatedly, Miller is alleged to have "expressed his intent to 'wipe' his files before leaving API and to establish a consistent pattern of conduct to prevent API from determining whether he accessed, copied, or transferred files for illicit purposes."  *Id.* ¶ 80.  And the allegation that he deleted the files after viewing them could support an inference that Miller had no legitimate work purpose for accessing them.  Most important, the Amended Complaint claims that at least some of the information Miller is alleged to have accessed had no connection to his employment duties, but could be of use to Plaintiff's competitors.  *Id.* ¶ 81.  Drawing all reasonable inferences in favor of Plaintiff, these allegations are enough to support a plausible claim that Miller copied some of this

information for reasons unrelated to his employment with API.  And if Miller in fact did so, then he would have violated his alleged contractual duties not to copy confidential information and to use that information only for work purposes.  *See id.* ¶¶ 44–45.  This is sufficient to state a claim for misappropriation under the DTSA.

### B.  Plaintiff has failed to state a claim for common law misappropriation and breach of the duty of loyalty (Counts 3 and 4)

Plaintiff also brings claims for common law misappropriation and breach of the duty of loyalty related to its confidential information.  Unlike the DTSA, the standards for these claims require that Plaintiff allege that Miller actually used or disseminated the information, not just improperly acquired it.  *See Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir. 2009) (common law misappropriation and unfair competition); *Leary v. Al-Mubaraki*, No. 18-cv-48, 2019 U.S. Dist. LEXIS 170117, at *9–11 (S.D.N.Y. Sept. 30, 2019) (breach of duty of loyalty); *Mercer Health & Benefits LLC v. Digregorio*, 307 F. Supp. 3d 326, 353–354 (S.D.N.Y. 2018) (common law misappropriation, unfair competition, and breach of duty of loyalty).  The Amended Complaint lacks any well-pleaded allegation that Miller used or disseminated this information, and Plaintiff in fact does little to contest this point.  Therefore, these claims are dismissed.

### C.  The Claim for Breach of Miller's Employment Contract Fails (Count 2)

Plaintiff also alleges that Miller breached several provisions of his employment contract with API.  First, Plaintiff claims that Miller's move to Fleetcor/CLC violated a restrictive covenant provision.  As part of his employment agreement, Miller agreed "for a period of one (1) year following the termination of [his] employment with API" not to "[b]e employed by, consult with, own, operate or be associated in any similar capacity with the following competitive travel management companies that perform travel management services provided by API or any of its

affiliated entities: Hotel Connections, Travelliance, TLX."  Amend. Compl. ¶ 43.  Under New York law, restrictive covenants "should be strictly construed." *Brown & Brown, Inc. v Johnson*, 34 N.E.3d 357, 361 (N.Y. 2015) (quoting *Gramercy Park Animal Center, Inc. v. Novick*, 362 N.E.2d 608, 609 (N.Y. 1977)).

Plaintiff has failed to allege that Miller actually breached this provision.  Even drawing all inferences in favor of Plaintiff, the Amended Complaint at most alleges that Miller is now working for Fleetcor in the corporate lodgings sector, not the travel lodgings sector that Plaintiff or Travelliance competes in.  Amend. Compl. ¶¶ 82–90.  Miller may or may not be doing his corporate lodgings work for Fleetcor's CLC subsidiary. *Id.* ¶¶ 85–86.  The Amended Complaint does not allege that Miller works for or is associated with one of the three specifically enumerated "competitive travel management companies that perform travel management services provided by API or any of its affiliated entities: Hotel Connections, Travelliance, TLX." Amend. Compl. ¶ 43.

Plaintiff argues that because Fleetcor owns Travelliance, Miller's new employment somehow falls within the ambit of the restrictive covenant, placing particular emphasis on the "associated in any similar capacity" language.  Even if the two companies are "associated" in some manner, that does not mean that Miller himself is "associated" with Travelliance in a capacity "similar" to "employ[ment] . . . consult[ing] . . . own[ership], [or] operat[ion]." *Id.*  The Amended Complaint does not allege that Miller will be doing work of any kind for Travelliance. As Defendants observes, the language in the restrictive covenant does not extend to parents or affiliates of the named companies.  And New York law requires restrictive covenants to be strictly construed.  *See Brown & Brown*, 34 N.E.3d at 361.  Plaintiff also notes that Miller only agreed to change jobs because Fleetcor acquired Travelliance.  It is true that Miller may have

changed jobs because he ultimately wants to work for Travelliance, but realized that he needed to do something else during the one-year restricted period after he left Plaintiff.  And it may also be true that by acquiring Travelliance, Fleetcor was able to meet this demand by giving Miller a different job for a year, after which he would be free to move to Travelliance.  But even if this theory is correct, it would not mean that Plaintiff has been deprived of the benefit for which it bargained: that Miller would not compete against Plaintiff with Travelliance for one year following the termination of his employment with Plaintiff.

Plaintiff also argues that Miller breached his employment agreement by failing to give written notice (including the name of the new employer) before accepting a new job, failing to provide his new employer with a copy of his API employment agreement, and failing to give Plaintiff notice of his intent to accept a new job.  However, the Amended Complaint lacks a theory of damages to go along with these alleged breaches.  In its opposition, the Plaintiff claims that because of these breaches, Plaintiff was forced to take steps to mitigate its damages including by conducting a forensic exam.  But the flaw with these allegations is that they do not appear in the Amended Complaint.

Accordingly, the claim that Miller breached his employment contract is dismissed.

### D.  The Tortious Interference Claim Fails (Count 5)

Plaintiff also brings a claim against the corporate Defendants for tortious interference with Miller's employment contract.  A claim for tortious interference requires, among other things, an actual breach of the contract at issue and damages resulting therefrom.  *See Rich v. Fox News Network, LLC*, 939 F.3d 112, 126–27 (2d Cir. 2019).  Because Plaintiff has failed to allege a claim for breach of the employment contract, the tortious interference claim fails as well.

### E.  The Claim for Breach of the Non-Disclosure Agreement's No-Poaching Covenant Is Dismissed (Count 6)

Plaintiff alleges that by hiring Miller, the corporate Defendants breached a no-poaching covenant that Fleetcor had previously entered into in connection with the parties' acquisition negotiations.  When Fleetcor approached Plaintiff about the possibility of acquisition, Plaintiff insisted on a non-disclosure agreement as a prerequisite to any negotiations.  Amend. Compl. ¶¶ 48–49.  Fleetcor and Plaintiff entered into a non-disclosure agreement that also contained the following no-poaching clause: "Fleetcor agrees that it shall not, directly or indirectly, solicit or hire, or attempt to solicit or hire, any employee or independent contractor of API (or any of API's affiliates) on behalf of Fleetcor or any other entity, nor shall Fleetcor induce, or assist any other entity to induce, any employee or independent contractor of API (or any of API's affiliates) to terminate or breach an employment, contractual or other relationship with API."  *Id.* ¶ 156. Defendants do not dispute that Plaintiff has alleged a breach of this provision. But they argue that this provision is unenforceable here.  The Court agrees.

Restrictive covenants like the clause in question "warrant[] judicial scrutiny beyond general contract principles."  *MasterCard Int'l Inc. v. Nike, Inc.*, 164 F. Supp. 3d 592, 601 (S.D.N.Y. 2016).  Such covenants restrict competition and therefore "must be reasonable" to be enforceable.  *Chevron U.S.A., Inc. v. Roxen Service, Inc.*, 813 F.2d 26, 28 (2d Cir. 1987).  "[T]he formulation of reasonableness may vary with the context and type of restriction imposed."  *Reed, Roberts Associates, Inc. v. Strauman*, 353 N.E.2d 590, 593 (N.Y. 1976).

The parties do not dispute these principles, but they differ on how rigorously a court should scrutinize a no-poaching agreement like this one.  Defendants would have the Court apply the strict standard applicable to restrictive covenants that are part of employment agreements. Courts will enforce a restrictive covenant in an employment contract "only if it: (1) is *no greater*

10

than is required for the protection of the *legitimate interest* of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." *BDO Seidman v. Hirshberg*, 712 N.E.2d 1220, 1223 (N.Y. 1999) (emphasis in original).  Plaintiff contends that the Court should instead treat the no-poaching covenant like a non-compete agreement made in connection with the consummated sale of a business.  These agreements, it contends, are presumptively enforceable.  However, even under the more lenient standard applicable to non-compete agreements in connection with the sale of a business, courts will only enforce a restrictive covenant if it is "reasonable in time, scope and extent."  *Reed, Roberts*, 353 N.E.2d at 593.

Neither the cases dealing with employment agreements nor those dealing with the sale of a business are a perfect fit for analyzing a no-poaching covenant contained in a non-disclosure agreement.  The interests involved are different.  A restrictive covenant contained in an employment agreement "may result in the loss of an individual's livelihood," and so must receive particularly rigorous scrutiny.  *Baker's Aid, a Div. of M. Raubvogel Co. v. Hussmann Foodservice Co.*, 730 F. Supp. 1209, 1214 (E.D.N.Y. 1990) (citing *American Inst. of Chem. Eng'rs v. Reber–Friel Co.*, 682 F.2d 382, 387 (2d Cir. 1982)).  The no-poaching agreement here, of course, would not prevent Miller from working in his chosen field; it would only prevent him from working for Fleetcor.  However, Plaintiff's interests are also weaker than those of the buyer of a business who bargains for the seller to refrain from competing with the newly sold business. Declining to enforce the no-poaching covenant would not subvert the confidentiality obligations at the heart of the non-disclosure agreement.  Enforcing it, on the other hand, would limit the employment options of nonparties to the agreement.  Unfortunately, there is a paucity of

authority under New York law governing the reasonableness of a restrictive covenant outside the circumstances of an employment agreement or completed sale of a business.

Some district courts have applied a third test, a "simple rule of reason" analysis, for "restrictive covenants in ordinary commercial contracts, such as a licensing agreement" that do not fit into one the two buckets described above. *Mathias v. Jacobs*, 167 F. Supp. 2d 606, 611 (S.D.N.Y. 2001); *see also Crye Precision LLC v. Bennettsville Printing*, 755 F. App'x 34, 36–37 (2d Cir. 2018) (collecting cases). Under this analysis, courts will "balance[e] the competing public policies in favor of robust competition and freedom to contract." *DAR & Assocs., Inc. v. Uniforce Servs., Inc.*, 37 F. Supp. 2d 192, 197 (E.D.N.Y. 1999). This includes consideration of "the totality of the circumstance," and whether "the covenant: (1) protects a legitimate business interest; (2) is reasonable in regard to geographic scope and temporal duration; and (3) the degree of hardship imposed upon the party against whom the covenant is enforced." *Navajo Air*, 318 F. Supp. 3d at 649. At least one court in this circuit has applied this test to a non-competition clause that was part of a non-disclosure agreement entered into in advance of merger negotiations. *See Calico Cottage, Inc. v. TNB, Inc.*, No. 11-cv-336, 2014 U.S. Dist. LEXIS 137816, at *13, 19–22 (E.D.N.Y. Sept. 29, 2014) (holding that a factual dispute remained as to whether there was a sufficient nexus between the shared information and any unfair competition).

The Court need not decide precisely what standard applies on these facts because the agreement is plainly unreasonable. *See Crye Precision*, 755 F. App'x at 37. Regardless of the particular context, the reasonableness inquiry under New York law focuses on the causal connection between the larger agreement, the breach at issue, and the interest that would be served by enforcing that contract and remedying that breach. In the sale-of-business context,

courts will enforce restrictive covenants "to protect the goodwill integral to the business from usurpation by the former owner while at the same time allowing an owner to profit from the goodwill which he may have spent years creating." *Reed, Roberts*, 353 N.E.2d at 593. Enforcement of the restrictive covenant is necessary to protect the buyer's benefit of the bargain. But this rationale would not apply to a non-compete provision that restricted the seller from competing with some other business owned by the buyer in a different industry, or for an unlimited duration. Likewise, in the employment agreement context, courts will enforce restrictive covenants to "prevent[] former employees from exploiting or appropriating the goodwill of a client or customer, which had been created and maintained at the employer's expense" as a result of the employment relationship. *BDO Seidman*, 712 N.E.2d at 1225. But a covenant that prevented a former employee from soliciting clients "with whom a relationship with [the former employee] did not develop through" their prior employment would be too broad. *Id.* Whatever the context, restrictive covenants may be enforced only so far as they protect a legitimate interest connected to the larger agreement in which they are situated. New York law does not allow enforcement of freestanding restrictive covenants to protect bare anticompetitive interests. *See id.* at 1224.

Plaintiff acknowledges in its opposition that the impetus for the non-disclosure agreement, including the no-poaching covenant, was that "Fleetcor obtained API's confidential information about the nature, origin, maintenance, and value of its goodwill" during the acquisition negotiations. Dkt. No. 88, at 17. "The no-poaching provision was specifically designed to protect that goodwill . . . ." *Id.* In other words, the parties added the no-hire provision because Plaintiff was concerned that Fleetcor would hire away employees as a result of information that it learned during the negotiations. Indeed, it would be hard to conceive of any

13

other rational reason for including a no-hire provision in a non-disclosure agreement, other than an illegitimate, anti-competitive motive.  Assuming that this interest is sufficient under New York law to support a no-hire provision, enforcement of the provision requires that there be a causal connection between information disclosed during the negotiations and the hiring of the employee.  *See Calico Cottage*, 2014 U.S. Dist. LEXIS 137816, at *19 (enforcement of non-compete provision in non-disclosure agreement requires "connecting the disclosed information with the subsequent, alleged unfair competition.").

The Amended Complaint lacks any allegation that Miller's hiring had anything to do with information disclosed during the negotiations.  It does not describe the information disclosed during the negotiations except to say that "API disclosed only the least necessary amount of proprietary, confidential, and trade secret data and information."  Amend. Compl. ¶ 47.  If anything, the Amended Complaint suggests that Travelliance developed an interest in hiring Miller before its acquisition by Fleetcor.  *Id.* ¶¶ 57–58.  Furthermore, Plaintiff's argument that it suffered harm from Miller's switch because he is "a very well-known individual in this space" undercuts its suggestion that its disclosures during the negotiations led to Miller's hiring.  *See* Dkt. No. 88, at 19, 21.  If Miller was already well known in the industry, it is less likely his hiring was a result of information Fleetcor learned during the negotiations.

Because Plaintiff fails to allege any connection between Miller's hiring and the non-disclosure agreement, enforcement of the no-hire provision would be unreasonable in this case.  The purpose of the no-hire provision was to protect information disclosed during the negotiations as a result of the non-disclosure agreement from being used to undermine Plaintiff.  Enforcing it, under the facts alleged, would not serve that purpose in any way.  The Court need not decide

what more, if anything, would be required to justify enforcing a restrictive covenant in this context.

### F.  The Negligent Misrepresentation Claim Is Dismissed (Count 7)

Plaintiff also brings a negligent misrepresentation claim.  It alleges that when "[w]hen asked about soliciting Miller on or about October 7, 2019, and when API requested that Fleetcor cease such activity, Fleetcor assured API that it would abide by its agreements."  Amend. Compl. ¶ 169.  It claims this statement gives rise to a tort, because Fleetcor was soliciting Miller at the time of the statement and ultimately hired him, in contravention of no-hire provision.  *Id.* ¶¶ 73–74, 170.

"Under New York law, the elements for a negligent misrepresentation claim are that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment."  *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000).

Plaintiff has failed to plausibly allege the existence of a special relationship.  "A special relationship may be established by 'persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified.'"  *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1109 (N.Y. 2011) (quoting *Kimmell v. Schaefer*, 675 N.E.2d 450, 454 (N.Y. 1996)).  It must "extend[] beyond the typical arm's length business transaction."  *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 103 (2d Cir. 2001).  The relationship between an

"ordinary buyer and seller" is not enough. *Dallas Aero., Inc. v. CIS Air Corp.*, 352 F.3d 775, 788 (2d Cir. 2003). "[P]rofessionals, such as lawyers and engineers, by virtue of their training and expertise, may have special relationships of confidence and trust with their clients," for example, but insurance agents usually do not. *Murphy v. Kuhn*, 682 N.E.2d 972, 974–75 (N.Y. 1997) (citations omitted).

Plaintiff argues that it had a special relationship with Fleetcor because the acquisition negotiations occurred over an extended period of time, and the parties entered into an extensively negotiated non-disclosure agreement. But length of the negotiations has no plausible bearing on whether there was a relationship of "confidence and trust" between the Plaintiff and Fleetcor. And the existence of a non-disclosure agreement is of no assistance either. A special relationship must be "independent of that created by the contract." *City of Syracuse v. Loomis Armored US, LLC*, 900 F. Supp. 2d 274, 303 (N.D.N.Y. 2012); *see also Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 516 N.E.2d 190, 194 (N.Y. 1987) (tort requires "violation of a legal duty independent of the contract"). The mere existence of a non-disclosure agreement is insufficient. To the extent the non-disclosure agreement is relevant, it suggests only that Plaintiff *distrusted* Fleetcor and felt the need to add additional protections.

Plaintiff has not plausibly alleged that it was in a special relationship of trust or confidence with Fleetcor independent from its non-disclosure agreement. Its negligent misrepresentation claim must be dismissed.

### G.  Plaintiff Has Stated a Claim for Unfair Competition (Count 8)

Plaintiff brings a claim for unfair competition under New York common law. "The essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another with some element of bad faith."

*Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 50–51 (2d Cir. 2019) (internal quotation marks and citation omitted).

Defendants do not address the appropriation element of the unfair competition claim but do argue that Plaintiff has failed to plead bad faith.  The Court disagrees.  Plaintiff has alleged that Defendants misrepresented whether they were soliciting Miller.  Amend Compl. ¶ 169.  It further alleged that had Defendants told the truth, Plaintiff would have taken additional steps to protect its employment relationship with Miller.  *Id.* ¶ 75.  This alleged act of deception is enough to make out a plausible case of bad faith.  Defendants protest that they only hired Miller to gain a permissible economic advantage.  Perhaps discovery will prove them correct.  But the Court cannot make such factual determinations on a motion to dismiss.  The Court notes that unfair competition is "a broad and flexible doctrine that depends more upon the facts set forth than in most causes of action."  *Barclays Capital Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876, 895 (2d Cir. 2011) (quoting *Roy Exp. Co. Establishment of Vaduz, Liech. v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982)).  Plaintiff has stated a plausible claim that it applies here.  Further factual development will determine whether it is right.

Defendants also argue that any unfair competition claim would be duplicative of Plaintiff's contract claim for breach of the no-hire provision.  But as Defendants recognize, this argument would only apply to the extent that "plaintiff has pled a breach of contract claim."  Dkt. No. 80, at 22 (quoting *Apotex Corp. v. Hospira Healthcare India Private Ltd.*, No. 18-cv-4903, 2019 U.S. Dist. LEXIS 116335, at *17 (S.D.N.Y. July 12, 2019)).  As discussed above, Plaintiff has failed to do so, and the Court accordingly dismissed that breach of contract claim.

Defendants' motion to dismiss the unfair competition claim is denied.

**H.  Plaintiff's Promissory Estoppel Claim Is Dismissed (Count 9)**

Plaintiff brings a promissory estoppel claim based on Fleetcor's agreement to the no-hire provision of the NDA.  *See* Amend. Compl. ¶ 181.  "In New York, promissory estoppel has three elements: a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made, and an injury sustained by the party asserting the estoppel by reason of the reliance."  *Cyberchron Corp. v. Calldata Sys. Dev.*, 47 F.3d 39, 44 (2d Cir. 1995) (internal quotation marks and citations omitted).

As Defendants point out, however, the promissory estoppel claim is duplicative of the breach of contract claim.  Plaintiff counters that it should be allowed to plead promissory estoppel as an alternative theory in the event that the no-hire clause is found to be invalid.  But a promissory estoppel claim cannot be used to, in effect, revive a breach of contract claim where the clause in question was found to be unenforceable because it violated public policy.  *Reed Elsevier*, 2014 U.S. Dist. LEXIS 2640 at *36 (citing *American Broadcasting Cos. v. Wolf*, 420 N.E.2d 363, 369 (N.Y. 1981)).  The vast majority of restrictive covenant cases will involve a clear promise, reliance, and injury.  Allowing litigants to use the equitable backstop of promissory estoppel in this manner would subvert the scrutiny New York law applies to restrictive covenants.

Plaintiff's promissory estoppel claim is dismissed.

**I.  Plaintiff's Claim for the Breach of the Covenant of Good Faith and Fair Dealing Is Dismissed (Count 10)**

Finally, Plaintiff claims that Defendants violated the implied covenant of good faith and fair dealing by hiring Miller, despite allegedly misrepresenting that they would refrain from doing so.

Under New York law, the implied covenant "requires 'that neither party . . . do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Wilder v. World of Boxing LLC*, 777 F. App'x 531, 535 (2d Cir. 2019) (alteration in original) (quoting *Kirke La Shelle Co. v. Paul Armstrong Co.*, 188 N.E. 163, 167 (N.Y. 1933)); *see also M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990); *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 500 (N.Y. 2002). "Breach of the covenant of good faith and fair dealing occurs . . . where the contract is not technically breached, but one party has acted to destroy or injure the right of the other party to receive the benefit of the contract." *Witherspoon v. Rappaport*, 65 F. App'x 356, 359 (2d Cir. 2003).

Because the no-hire provision is unenforceable, Defendants' conduct did not deprive Plaintiff of any fruit of the contract to which it was entitled. *Hadami, S.A. v. Xerox Corp.*, 272 F. Supp. 3d 587, 598 (S.D.N.Y. 2017) ("Because the duties imposed by the implied covenant of good faith and fair dealing arise as a result of the formation of a contractual relationship between the parties, a claim for breach of the implied covenant of good faith and fair dealing must be dismissed when there is no valid and enforceable contract between the parties."). Thus, Defendants did not breach the implied covenant of good faith and fair dealing. This claim is therefore dismissed.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss in GRANTED with respect to the breach of contract claims (Counts 2 and 6), the common law trade secrets claim (Count 3), the duty of loyalty claim (Count 4), the tortious interference claim (Count 5), the negligent misrepresentation claim (Count 7), the promissory estoppel claim (Count 9), and the implied

covenant of good faith and fair dealing claim (Count 10).  It is DENIED with respect to the

DTSA claim (Count 1) and the unfair competition claim (Count 8).

       The Court will reschedule the initial pretrial conference by separate order.

       This resolves Dkt. No. 79.

       SO ORDERED.


Dated: November 23, 2020
      New York, New York

_____
           ALISON J. NATHAN
        United States District Judge